Juan Federico Basora Defilló et al., Plaintiffs and Appellants, v. Rafael Picó, Secretary of the Treasury, Defendant and Appellee.

No 283.    Decided April 1, 1963.

2

*Enrique Báez García* for appellants. *J. B. Fernández Badillo, Solicitor General, Arturo Estrella, Acting Solicitor General, Genoveva R. de · Carreras* and *Juan A. Faría, Assistant Solicitors General,* for appellee.

Division composed of Mr. Chief Justice Negrón Fernández, Mr. Justice Blanco Lugo, and Mr. Justice Dávila.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

Section 6 of Act No. 99 of August 29, 1925, as amended by Act No. 233 of May 10, 1949, 13 L.P.R.A. § 895, provides that whenever so ordered by the Secretary of the Treasury, estates the object of a grant shall be appraised *"at their market value"*[1] as of the date of the death or of the grant.

---

[1] For the purposes of levying the property tax the Act refers to the assessment of the property *"in its actual and effective value"* for which the Secretary of the Treasury may use *any of the methods* with respect to property valuation and assessment. Section 3 of Act No. 117 of May 9, 1947, as amended, 13 L.P.R.A. § 432. *Cf.* § 295 of the Political Code, 1902 ed., as amended, 13 L.P.R.A. § 447, which, in indicating as index the "actual ·and effective value" refers to the factors in the matter of valuation or assessment, "including the market value, without looking to a

Originally reference was made to "a fair and proper appraisal"— § 6 of Act No. 99 of 1925, *supra.* Later, Act No. 20 of April 27, 1933 (Sess. Laws, p. 232) mentioned "a fair and adequate appraisal" which subsists in Act No. 303 of April 12, 1946 (Sess. Laws, p. 782) upon reforming the tax system for the purpose of levying the inheritance tax. Precisely, the only controversy raised in this appeal is connected with the challenging of the market value[2] of five rural properties assessed by an officer of the Department of the Treasury, which assessment served as a basis for levying the corresponding tax to the appellants in their capacity as heirs of Josefa Defilló González.

The aforesaid predecessor died in Mayagüez on August 9, 1955 under an open will in which, after providing for several legacies, she instituted her nephews Juan Federico and José Antonio Basora Defilló and her niece Isabel Basora Defilló as her sole and universal heirs. The principal portion of the estate consists of five rural properties situated within the municipalities of Hormigueros and San Germán, which constitute a unit for the purposes of agricultural exploitation

forced sale." See *People* v. *Amadeo*, 82 P.R.R. 98 (1961), and the dissenting opinion at pp. 118 to 129.

As to the basis for determining gain or loss on a property transferred at death, § 113(a)(5) of the Income Tax Act of 1954, 13 L.P.R.A. § 3113(a)(5) indicates that it shall be *"the fair market value"* of such property at the time of such acquisition. *Cf. Heirs of Armstrong* v. *Tax Court*, 74 P.R.R. 171 (1952).

[2] In the opposition to the issuance of the writ of review and in the memorandum presented by the Secretary of the Treasury, it is repeatedly stated that the Legislature did not have the intention to adopt the rule of market value as the only basis for the assessment of the property inherited or granted, and it is added that the present case illustrates the impossibility of using it invariably. This notwithstanding, in his final brief, after the writ was issued, the respondent sets forth that "the rule established is to the effect that notwithstanding the difference in the language used in the different tax statutes, what seems to count always is the fair market value of the property in question."

As a matter of fact the only evidence presented by the Secretary in support of his assessment was the report from engineer Lang which indicates that his purpose was to estimate "the market value."

in the planting and cultivation of sugarcane. Its whole area is 329.99 cuerdas. The Secretary of the Treasury assessed the properties in the sum of $263,799.76, which assessment was challenged by the heirs in their writing filed in the Superior Court, San Juan Part, alleging that it was excessive and that the value did not exceed $130,000.[3]

The documentary evidence offered in the trial court consisted of a drawing of location of the five pieces of property, which for the purposes of this opinion we shall call Hacienda Luisa Josefa, a plan showing its soil composition, a report of the production of the estate during the decade between 1945 and 1954, and two certificates from the registry to establish the sale of an adjacent lot of 22 cuerdas and the lease of another neighboring property. With the testimony of two engineers acquainted with the valuation of real property and who are familiar with the hacienda, the case was submitted. It is fair to indicate that the essence of the testimony of the expert of the government was presented, upon the insistence of the trial court, in a written report and that he was not cross-examined as to its contents notwithstanding the fact that the plaintiff was given the opportunity to do so. The lack of the specialized knowledge possessed by the trial court has deprived us of clarifying a number of angles of the aforesaid report on which the judgment appealed from is *exclusively* based. *Cf. Passalacqua* v. *Heirs of Passalacqua*, 87 P.R.R. 557 (1963).

■■ After setting forth a summary of the evidence presented, and making certain comments with respect to the opinion of both experts to correct mistakes and gaps, the trial judge concludes that "the first part of the work accomplished by expert W.E. Lang,[4] in which he determines that $263,799.76 represents the value of the five pieces of land

---

[3] The evidence presented by the plaintiffs established a value of $160,000.

[4] The trial court refers to the report of expert Lang, which we copy below:

and the buildings thereon in August 1955, has not been challenged with authentic evidence in opposition thereto, and

---

*"Soil type, topography and erosion:*
I—Properties A and B

| Soil | Cuerdas | Slope | Erosion |
|---|---|---|---|
| 1—Toa Clay Silt | 81.40 cds. | Flat | None |
| 2—Coloso clay | 105.40 " | " | " |
| 3—Coloso clay silt | 9.90 " | " | " |
| 4—Lares clay | 5.30 " | " | " |
| Lares clay | 13.80 " | Partly flat | Very little |
| 5—Juncos clay | 1.60 " | " " | " " |
| Juncos clay | 2.60 " | Rolling | Little |
| 6—River sand | 2.10 " | — | — |

222.10 cds.

| Soil | Cuerdas | | Value per cuerda | Total |
|---|---|---|---|---|
| T2 AO | 81.40 | x | $1,000.00 | $81,400.00 |
| CS 1AO | 105.40 | x | 900.00 | 94,860.00 |
| CS 2AO | 9.90 | x | 900.00 | 8,910.00 |
| LS 1AO | 5.30 | x | 530.00 | 2,819.00 |
| LS 1B1 | 13.80 | x | 465.00 | 6,417.00 |
| JN 1B1 | 1.60 | x | 340.00 | 544.00 |
| JN 1C2 | 2.60 | x | 240.00 | 625.00 |
| RW | 2.10 | x | 20.00 | 42.00 |

222.10 cds.      $195,617.00

195,617 ÷ 222.10 = $880.85—average per cuerda

Property A: 218.10 cds. x $880.85 = $192,113.39

*Structures:*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

Value Improvements   $ 1,050.00
Total Land and Improvements   $193,163.39

Property B: 4.00 cuerdas x $880.85 = $3,523.40

II—Properties C, D and E

| Soil Type | Area | Slope | Erosion |
|---|---|---|---|
| 1—Toa clay silt | 27.73 | Flat | None |
| 2—Toa clay loam | 3.50 | Flat | " |
| 3—Coloso clay | 26.29 | Flat | " |
| 4—Lares clay | 9.54 | Partly flat | Very little |
| 5—Juncos clay | 7.85 | Partly flat | Very little |
| Juncos clay | 13.99 | Rolling | Little |
| 6—Múcara clay loam | 13.78 | Steep | Moderate |
| 7—River sand | 5.21 | — | — |

Total 107.89 cds.

their estimates connected with said value have not been successfully rebutted. We must therefore uphold them and dismiss the complaint." Thus plainly stated, it would seem that we are precluded from exercising our reviewing mission because a mere weighing of the evidence is involved, but as we indicated in *Commonwealth* v. *Fonalledas*, 84 P.R.R. 552 (1962), with respect to the weighing of expert evidence we are in the same condition as the trial judge, since it is not, strictly speaking, a question of settling a conflict of the evidence clearly defined. Here we have no notable discrepancy

| Soil | Cuerdas | | Value per cuerda | Total |
|---|---|---|---|---|
| T2—AO | 27.73 | x | $1,000.00 | $27,730.00 |
| T3—AO | 3.50 | x | 1,000.00 | 3,500.00 |
| Cs 1AO | 26.29 | x | 900.00 | 23,661.00 |
| Ls 1B1 | 9.54 | x | 465.00 | 4,436.00 |
| JA1 B1 | 7.85 | x | 340.00 | 2,669.00 |
| JA1 C2 | 13.99 | x | 240.00 | 3,358.00 |
| Mu 3D3 | 13.78 | x | 120.00 | 1,654.00 |
| | 5.21 | x | 20.00 | 104.00 |
| | 107.89 | | | $67,112.00 |

$$\frac{\$67,112.00}{107.89} = \$622.05 \text{ average per cuerda}$$

Property C:
    47.60 cds. x $622.05 = $29,609.58

Property D:
    51.83 cds. x $622.05 = $32,240.85

Property E:
    8.46 cds. x $622.05 = $ 5,262.54

*Summary:*

| Property | Cuerdas | Land | Improvements | Total |
|---|---|---|---|---|
| A | 218.10 | $192,113.39 | $1,050.00 | $193,163.39 |
| B | 4.00 | 3,523.40 | — | 3,523.40 |
| C | 47.60 | 29,609.58 | — | 29,609.58 |
| D | 51.83 | 32,240.85 | — | 32,240.85 |
| E | 8.46 | 5,262.54 | — | 5,262.54 |
| Total | 329.99 | $262,749.76 | $1,050.00 | $263,799.76" |

as to the physical characteristics of the property object of the assessment. And even though the presumption of correctness of the administrative determinations of the Secretary of the Treasury extends to a case like the one at bar, its effect cannot prevail if it is shown that the method used in the assessment made by the latter and upheld by the court followed a most strict pattern, without taking into consideration other factors which appear from the evidence and which undoubtedly affect the final determination of the market value. *Cf. Vilanova* v. *Sec. of the Treasury*, 83 P.R.R. 72, 79–80 (1961); *Collazo* v. *Sec. of the Treasury*, 82 P.R.R. 629 (1961); *Carrión* v. *Treasurer of P.R.*, 79 P.R.R. 350, 364 (1956).

■■ We have repeatedly held that the market value is the price that a purchaser would be willing to pay in a voluntary sale and that a vendor would be willing to accept, considering for said purpose the conditions of the property at the time of the appraisal and the most productive and beneficial use to which it could be devoted in the reasonably near future. *Commonwealth* v. *Fonalledas, supra; Commonwealth* v. *317.813 Cuerdas of Land*, 84 P.R.R. 1 (1961); *People* v. *Colón*, 73 P.R.R. 531 (1952); *People* v. *Huyke*, 70 P.R.R. 720, 722 (1950). To that effect, the sale of similar properties constitutes the principal index of the market value. *People* v. *Amadeo*, 82 P.R.R. 98, 118 (1961). That is the first difficulty we meet in the present case, for there are actually no contemporaneous similar sales in the community which offer an adequate basis of comparison for the process of evaluation. During the course of the hearing reference was made to the sale of an adjacent lot of 22 cuerdas for the price of $22,000, but the difference in area is so apparent that it very properly was not considered as a similar sale, but merely for the purposes of ascertaining or verifying the assessment made by the tax expert, on the basis of a com-

parison as to the soil composition and topography.[5] Nor is there any discrepancy as to the fact that the property is devoted to its best use, that is, to the production of cane, with the exception which we shall indicate hereinafter.

It is necessary to take into consideration other factors offered by the evidence presented. The assessment made by expert Lang was based exclusively, regardless of his statement to the contrary, on the types of soils, and on the topography and erosion of the parcels of land. Engineer Colom, appellants' expert, significantly applies the test of economic yield of the land. Although both stated that they took other factors into consideration, a reading of their testimony or reports convinces us that they actually limited themselves to choosing a more or less strict formula based on their preference as to the specific method of appraisal. There is no doubt that these factors—nature of the soil composition and topography, as well as the economic yield and productivity—should be taken into consideration, not in isolated form and unconnected within themselves, but taken as a whole and in addition to other conditions which undoubtedly affect the market value. A fact that cannot be overlooked is that in 1955 the property was subject to a lease contract,

---

[5] Even as to this aspect the report of assessor Lang gives the impression that it is a justification conceived *a posteriori* to support his valuation of Hacienda Luisa Josefa, for although the properties are adjacent to each other, the same type of soil is valued in a different manner, as we indicate below:

| Soil Type | Hacienda Luisa Josefa | Parcel of 22 cuerdas |
|---|---|---|
| Toa clay silt | $1,000 per cuerda | $1,245 per cuerda |
| Coloso clay silt | 900 per cuerda | 1,130 per cuerda |
| Lares clay (flat) | 530 per cuerda | 665 per cuerda |
| Lares clay (partly flat) | 465 per cuerda | 580 per cuerda |

It may be admitted that there might be a reason to explain these differences, but it does not appear from the report. The same situation exists as to the appraisal attributed to the different types of soil of property Macona, where different valuations are also made for the same type of soil, notwithstanding the fact that it is a property with a similar area, in the same vicinity, situated one kilometer from Luisa Josefa.

the term of which did not expire until 1958, paying an annual rental of $10,000, which, capitalized at 6% as suggested by the respondent, would give a valuation of approximately $166,666. Any purchaser desiring to acquire the property in 1955 had to take this fact into consideration because it was probably an unprofitable lease for the lessor.[6] It is likewise significant that only two-thirds of the property is devoted to the planting of cane—216 cuerdas—and we should presume that the lessee—Heirs of Mateo Fajardo, owners of the adjacent Central Eureka—because of the closeness of their mill, was engaged in a most intense harvest in order to obtain a greater yield. Finally, we cannot wholly disregard the testimony of Colom as to the manner in which he determined the appraisal on the basis of the productivity of the land considering an average benefit of $1.50 per ton of cane produced. Lang's report on this aspect considers the average profit actually obtained during the last 8 years,[7] but he ignores the fact that the benefits have continued in a descending scale, to the point that in the year immediately preceding the date of the assessment it only yielded $1.07 per ton.[8]

Taking into consideration all the circumstances and the different facts and conditions which we have mentioned, we believe that an appraisal of the land, excluding the improvements,[9] for the amount of $200,000 represents a more reasonable and fair valuation and a more adequate repre-

---

[6] After 1958, and for a term of 10 years, a contract was executed for an annual rental of $13,000, the capitalization of which at the aforesaid rate would be approximately $216,666.

[7] The result of the application of this method was an appraisal for $283,658, but the respondent judge indicates the commission of an error in the determination of the average profit, which would reduce it to $241,312.33.

[8] Witness Colom stated that the average of the years 1954 to 1958 was $1.26 per ton produced.

[9] The assessment of the improvements of $1,050 was not challenged.

sentation of the market value of Hacienda Luisa Josefa in August 1955.

Judgment fixing the value of the five pieces of property which form part of the estate in the amount of $200,000 will be entered and the case remanded for further proceedings not inconsistent with this opinion.